Now, here argument in Marcal Paper Mills, another easy case for today. Excuse me, let me just, go ahead. Good morning, and may it please the Court. I'm James M. Hirshhorn of Sills, Cummins & Gross, appearing for Appellant Marcal Paper Mills, LLC, and I'd like to reserve three minutes of my time for rebuttal. Granted, we haven't extended the time in this case because it doesn't present, it does present some issues, but not as many as the preceding case. Well, I hope that's good news. What I'd like to use my available 12 minutes for is to leave the Court with four points. The first is that withdrawal liability under the MPPAA is not the product of what Section 503B of the Bankruptcy Code calls services rendered after the commencement of the case. And I put the emphasis on the word rendered because Judge Alito, the then-Judge Alito in Hechinger's, put particular emphasis on that as to determining whether or not compensation for services could fall within an administrative expense. Do you think it can? Do I think that any motion? I mean, you think payment of the withdrawal liability should be an administrative expense? No, Your Honor. It's our position that no portion of it can be recognized as an administrative expense. Before you get into the merits, could you address the standard of review, please? Because in HNRC, the bankruptcy appellate panel over in the Sixth Circuit reviewed the bankruptcy court's decision for abuse of discretion. But I understand you to be arguing that it's de novo review. Is that right? We are in a different procedural stage than HNRC. In HNRC, there was a full hearing on not simply the legal issue of whether or not the withdrawal liability could be included as an administration expense, but also on how it was computed and the amount. And because of that, it came to the bankruptcy appeals panel as a mixed question of law and fact. Thank you. In this case, because the Teamster's plan did not put before the bankruptcy court any computations or any allocation between pre- and post-petition expenses, you had a pure decision of law by the bankruptcy court. You had a reversal of that decision of law by the district court with a remand to the bankruptcy court to get into the factual issues. Second point I'd like to leave the court with is that the withdrawal liability is not an expense of administration because unlike expenses of administration, it's not under the control of the debtor. The third point is that if you... Well, if the debtor is not a debtor in possession, then it wouldn't be under the control of the debtor anyway. I mean, isn't it only within the control of the debtor if the debtor's in possession? We're in Chapter 11, so we're dealing with the debtor as debtor in possession, and the debtor in possession has the obligation, fiduciary obligation to the creditors. I won't say to minimize because that's incorrect, but to optimize expenses of administration. Counsel, is that a policy argument? No, Your Honor, it is both a policy argument and a legal argument. Let me, if it's focused at least admittedly in part on policy, would not the same logic apply to workers? Because without the workers, there would be no debtor in possession in business. I don't think that's correct, Your Honor, because debtor in possession's obligation in the creditors' committee case, which dealt with the standing of creditors' committees to pursue fraudulent transfer applications, the court noted that the debtor in possession is in something of the position of the fox in the henhouse. It is the incumbent management, but its duty is not simply to manage in the self-interest of itself and the owners, but to manage the business in the interests ultimately of a successful reorganization, one in which the enterprise continues if that's economically feasible, and in which value is maximized for the creditors, bearing in mind that because we're in bankruptcy, bankruptcy is by definition shared pain. There will never be enough to go around for everybody, but it's the debtor's position, duty to make the best of the bad situation, and what that requires it to do is to control the amount of administrative expenses and decide whether or not to undertake them on a cost-benefit analysis to, for example, with labor costs, put on or take off an extra shift depending on whether that's going to be profitable. In the McFarland's case out of the Second Circuit, for example, the debtor wound up withdrawing from a multi-employer plan because it decided that the unit of its business that was represented by unionized employees who were participants in the plan wasn't worth continuing, and it simply discontinued that business and discharged the employees. And what that leads to is that because the debtor can't control the amount of withdrawal liability and the way that it controls administrative expenses, you have an interference with the progress of the reorganization, with the debtor's flexibility to reorganize, and you also have, and I'll come to this in a few moments, a perverse incentive on the debtor's part to withdraw from the plan early, which is contrary not only to the Bankruptcy Code, but it's contrary to the policy in the MPPAA. The point I'd like to make... Why is it contrary to the MPPAA? Isn't the whole point of that statute to protect all of the employees whose employers have put money in for them? A couple points. First of all, the intent of the statute is much broader than that. It's to protect the employees who are beneficiaries of the multi-employer pension plan, many of whom, or even most of whom, are not employees of the debtor at all. No, sure, but the general MPPAA intent is for all of the employees to protect the pensions of all of the employees for all of the employers in the industry. Let's focus on that. The purpose of the MPPAA was to avoid the death spiral phenomenon of employers... It was to let employers get out and pay nothing. Exactly. Employers believing the plan was in trouble and getting out. It's a deterrent to withdrawal. It's supposed to give employers an incentive to remain in the plan. In the bankruptcy context, however, the incentive works the other way. The trigger for liability under the MPPAA, the five-year look-back period, is the end of the plan year immediately preceding the date of withdrawal. So that if the employer withdraws in such a way that, as in McFarland's, all of the withdrawal liability is pre-petitioned, then under ERISA itself, only 50% of that becomes a general expense. None of it is priority. Under 29 U.S.C. 1405B, which is part of ERISA, not part of the Bankruptcy Code, Congress has declared that half of it becomes an expense of administration and the other half is subordinated to the other general creditors. So that it's advantageous to general creditors for the employer to withdraw at the outset of the proceeding or even immediately before the proceeding because it pushes withdrawal liability down. But you're assuming that the employer will know five years out that it's going to go bankrupt. No. I thought you were saying the incentive is that they ought to withdraw the day before they file. Exactly. Because if their lawyers are working up the bankruptcy filing, prudence would dictate that they ought to withdraw right before filing because then it would all be a pre-petition expense and debtors don't really care about pre-petition expenses because it all goes into the hopper for the creditor. Your Honor has rephrased my point exactly. So if you make it an expense of administration, what happens at that point is that, first of all, the employer may not want to do this because that's going to be terribly disruptive of labor relations. Reorganization is supposed to buy the employer time. It's got 120 days in which to propose a plan. If it makes that decision immediately, it's already disrupted the operations of the enterprise. Well, so is the bankruptcy. All right, but you agreed, do you not, that the salaries paid to the workers, the truckers here, post-petition are administrative expenses under Section 503B. The salaries, wages, et cetera, are necessary to the preservation of the estate, correct? Yes, salaries are and I will go further. Normal pension contributions are. All right, so. Here's the difference. So, you know, the company, the DIP is operating. The DIP wants the truckers to keep driving and making money for the DIP and the DIP is paying these vested pension benefits. Aren't you asking us to allow the DIP to have its cake and eat it too by not contributing a dime toward withdrawal liability? No, Your Honor, because here's the difference. First of all, there's a direct relationship between hours of work and both the wages and the normal pension contributions. The DIP has the flexibility, as I said, to ramp up operations or to draw operations down to control expenses. The withdrawal liability, on the other hand, isn't related to hours of work. Well, but can't we issue a, in this case, couldn't we articulate a rule of law that provides some commensurate relationship between your withdrawal liability and the amount of new vested pension benefits created post-petition? I don't think you can and here's why. Withdrawal liability is a two-step process and three steps in bankruptcy. I'm sorry. You're on his time. That's okay. Go ahead. First step is to examine the size of the pie, which is the amount of unfunded vested benefits. None of the size of the pie relates to the amount of work done by the debtor's employees post-petition. It relates to actuarial assumptions. This is all laid out in HNRC and it relates most importantly to the investment performance of the fund. Let me use a hypothetical. You can have the same employer goes into Chapter 11, maintains operations for two years, and at the end of the two years withdraws from the multi-employer plan, either by renouncing the collective bargaining agreement or by doing what was done in this case, which is a 363 sale to a new buyer who doesn't make a deal with the union. Depending on when the employer does that, depending on the state of the market, you'll get an entirely different withdrawal liability. You have the same employer, same amount of work done, but if you have a withdrawal date in 2005 when the market is up, you have a withdrawal date in 2009 when the market was at its trough, you have a withdrawal date in 2011. That's a hazard of participating in the pension plan. But what that means is why should a company not in bankruptcy have to suffer the hazard and the dip is exempt from that hazard? The dip is getting direct benefits by having these employees work and creating new vested pension benefits for those working employees. And their contributions. The answer to that, Your Honor, is that first of all the – excuse me. First of all, if you have an employer that's not in bankruptcy, the employer's obligations to all of its creditors are what they are. Bankruptcy is intrinsically going to involve a reduction in obligations to creditors. Second of all. Well, I'm sorry. I'm sorry I have to challenge you on that, though, because pre-petition, I'm with you, but post-petition, it's a new ball game, and that's why dips have to pay 100 cents on the dollar to their investment bankers, their lawyers, and all the other people that keep working for the dip post-petition. Why are these truckers treated differently? But what they pay to their employees post-petition and to their investment bankers, their professionals, and the like, those are contractual expenses. Those are either voluntarily assumed by the dip when you engage professionals or when you agree to a breakup fee for a buyer, or the dip has control of it by controlling the amount of services. What you do when you. Until they get the bill from the investment bankers and have sticker shock. Is that not a hazard? But then that's section 502. The bankruptcy court has the ability to control that sticker shock. Didn't the district court recognize this when the district court remanded it back to the bankruptcy court to do the calculations? No. The district court simply assumed that it could be done, and it's our position that it can't be done as a matter of law. Was it a learned assumption? Yeah. A learned assumption. The reason why it can't. I have two points on that. The reason why it can't be done is that, first of all, to take Judge Hardeman's hypothetical, what you've done is you've made the dip the insurer of the stock market. If the market goes up, its withdrawal liability goes down. It can't be prorated, counsel. It cannot be prorated. Your Honor, that's the difference between the size of the pie and the slice of the pie. What the district court has required to be done is three things. First of all, you have to determine the size of the pie, which is the amount of unfunded invested benefits, and that's going to be based in very large part on investment performance and entirely on factors outside the control of the debtor. The second thing you have to do is you have to determine the slice of the pie, which is the proportionate share of unfunded vested benefits that are attributable to this employer, to this debtor. Would your position basically ask this court to send a message to workers or employees of the debtor in possession, don't go to work? No, it would not. You will have no pension. No, it would not, for two reasons. First of all, before I answer that question, can I finish the third point in response to your last question, which is that the third task, which the bankruptcy court has now, or the district court has now required to be done, is that you have to slice the slice. You have to take the debtor's share of the total unfunded vested benefits, which is the slice of the pie, and you have to apportion that between pre- and post-petition liability. And the only way I think you can do that is to look at what withdrawal liability would have been if it had been done as of the petition, and then to look at what withdrawal liability was at the date of the actual withdrawal, and to allocate that portion. But if you do that, what that means is, let's assume the market has gone up. It can be there's no withdrawal liability because the unfunded vested benefits as of the withdrawal date are less than the unfunded vested benefits would have been if the withdrawal had been at the petition date, so that none of the performance of services by the debtor's employees increased unfunded liability. Now, to go back to your second question, Your Honor, are we sending a message to the employees not to go out, not to show up to work? The answer to that is no. The reason for that is that, one, they're receiving their wages. Two, they're receiving the normal pension contributions, all of which were paid in full by the debtor in this case. Maybe the question is not sending a message to not go to work, but go to work elsewhere where you would get both your salary and your pension benefits. Well, they're going to get their pension benefits anyway because the employer, the debtor, is not liable for the pension benefits. The fund is liable for the pension benefits. The fund has other resources, which is the other continuing employers, and ultimately the fund is backstopped by the resources of the PBGC. So whether or not withdrawal liability is paid in any given case does not deprive the employees of their vested pension benefits. What it does do, in terms of not going to work, is that one of the principles of Chapter 11, the principle that underlies cram-down in Section 1129B, is that something is better than nothing. In theory, employees could say, or the union could say, unless the debtor promises up front that it will pay all withdrawal liability as an expensive administration, we are going to walk out immediately. But if they do that, they lose their wages, they lose their normal pension contributions, and they probably kill the reorganization. So I would suggest that this is fair. It's within the policy of the Bankruptcy Code, and it's within the policy of ERISA, because Section 1144D expressly states that ERISA does not override or impair any other law of the United States. To follow HNRC and to decide that withdrawal liability is not an expense of administration because it benefits persons other than the debtor and its employees. Thank you. You have far exceeded your time, but you did save quite a bit for rebuttal. Three minutes. Thank you, Your Honor. Thank you. Good morning, Your Honor. It's Paul Montalbano on behalf of Trucking Employees of North Jersey Pension Fund. We're pleased to court. I always thought administrative expenses were what is needed right now for the entity to continue. The electricity, wages, because you need the employee. How is withdrawal liability part of that? I mean, in the long run, yes, but not in the short run. And I always thought administrative expenses were the short-run expenses. Am I wrong? You're not wrong on the administrative expenses, but I think what you're wrong on is not understanding how withdrawal liability plays a part of this. What I was going to first start explaining is that, of course, ERISA and the Multi-Employer Pension Plan Act is a remedial statute, and accordingly it should be given full scope. But similarly is the bankruptcy code. Well, that's true of all expenses that have not been paid, all debts, let's say. Let me go right to the expenses, and I'll move on from my argument for a moment. No, yeah. On administrative expenses, we've heard that they need to be both direct and substantial benefit to the estate. That is the key argument that I hear from the appellant. What is a direct and substantial benefit to the estate, and who is providing these benefits? It is the employees that are providing these benefits by providing their labor to the estate to do the work of the estate. As I outlined in the brief, the debtor or debtor in possession had the ability to, because we provide the transportation systems, we drove the trucks, we delivered their products to their customers. The debtor in possession had the ability to choose how to handle how they were going to do their transportation system. Now, they had a collective bargaining agreement with the union. The collective bargaining agreement with the union said that they would pay a certain amount of wages, they would pay health insurance, and they would pay a pension benefit. Now, it's important to understand that the pension benefit that's involved here is a defined benefit, not a defined contribution. Now, we heard the appellant say, but, Your Honors, we paid the normal pension contributions. There is no such thing as a normal pension contribution. They admitted a normal pension contribution is administrative expense. But in a defined benefit plan, a normal pension contribution is the cost that is required to be paid to pay for a year of pension credit. What the appellant is, in essence, saying is, we want to pay a certain dollar amount only. We'll call that the normal pension contribution. And in essence, convert your defined benefit into a defined contribution. We just want to pay X amount of dollars per hour, and that's the end of it. But that's not what the collective bargaining agreement calls for. That's not what the agreement was with the employees. The employees would work, and they would have payment made to their pension fund, and they would receive a defined benefit. But they're still going to get it. I mean, isn't that one of the difficulties you have to deal with here, is that even if we rule against you, and even if we say that there's no withdrawal liability whatsoever, your clients get 100 cents on the dollar because the liability falls to the fund, and if the fund can't satisfy its liability, then it falls to the taxpayers through the PBGC. Let me make it clear that my client is the fund, not the individual employees or participants. Now, your comment is participants, through their work with the employer, that the fund is obligated to give them a pension credit if they work that year for that employer. The fund has to come up with the money somehow. Now, this is one of the reasons why... Or the government. Well, or the other employers. In essence, what Appellant is saying is, allow the pension fund, which is not even in direct privity with this debtor in possession, let the pension fund subsidize the creditors and the debtor in possession by requiring the pension fund, and when I heard him say it during his argument, but the employees are not getting hurt. They're going to be required, the pension fund is going to be required to fund that pension fund anyway. What you're saying is the fund has more standing than anyone. The fund has an interest here, but the fund is... The fund has an interest, but the employees... It's a strange case, because the employees are not getting hurt no matter what happens here. The fund gets hurt if we rule for Markell. That's exactly right. The fund gets hurt because they don't have the money in order to pay for the pension funds. Right, but here's the difficulty. Markell could care less about the fund. Markell needs the guys to drive the trucks and do the work. The fund, why worry about the fund, right? So from the company's perspective, the DIP's perspective, the actual necessary costs of administering the estate are just paying the employees, not taking care of this distant fund about which it could care less. And we believe, the fund believes, is that legal obligation under the collective bargaining agreement... They all have legal obligations. In other words, every creditor has a legal obligation to get the full amount given or lent. But the problem is that the employer is bankrupt and can't pay it now and may not be able to pay it... Or may pay only 10%, depending what the plan ultimately... I don't know what the legal obligation gets you, where it gets you. Let me explain that. If the debtor, at the time they filed the petition, were to terminate the collective bargaining agreement, now there's no longer that obligation for the fund to provide a pension credit during the time of the debtor in possession. Let's assume the debtor in possession operates for five years. If they're under the collective bargaining agreement, the pension fund is obligated to pay a defined benefit for those five years of service. If the debtor in possession does not adhere to the... terminates the collective bargaining agreement at the filing, now the pension fund is not required to provide that pension benefit to those employees, and it's up to the union and the debtor in possession to enter into a new agreement as to how the retirement fund... retirement benefit is going to be provided to the employees. But you want us to give priority, in a sense, to the pension benefit. And it's not one of the statutory priorities. I think what we heard in admission by the appellant is that labor costs, wages, and he indicated... Current wages. Yes, and we're only talking... But this isn't a current expense that you're asking for. Well, the withdrawal liability has nothing to do with what they're doing right now to keep the business going, right? Oh, yes, it does. It does. And I think... It's not like electricity. Well, it's labor, and it's a cost of labor. Well, you're saying they'll go on strike or they won't work? Well, pension credit is a requirement of the contract. My point is that every debt is a requirement of whatever that contract is, so why should this one be put ahead of all the others? Because that's what an administrative expense will do. Well, we're talking about labor that was provided for after the petition. Pursuant to a post-petition contract, a memorandum of understanding. It was a post-petition contract. Well, they adhered to the collective bargaining agreement. They assumed it. Now, they have the option under the bankruptcy code to terminate that collective bargaining agreement or to negotiate changes first, and if they are not successful in negotiating changes, they can repudiate the collective bargaining agreement, which allows the pension fund to be out and incur no further liability. They did not do that. As a result, the pension fund, as part of the compensation... What do you mean, incur no liability? They incurred liability for what happened before the bankruptcy. That doesn't get wiped out because of the bankruptcy. That would be an unsecured creditor claim against the debtor. What we're asserting here is an administrative claim against the debtor in possession. Now, part of the colloquy that I heard earlier was concerning the apportionment. How should this withdrawal liability be apportioned? That issue has not been addressed yet. What he said is that it's very difficult, and that's in the brief too, very difficult to calculate. But it can be calculated. Shirley, though, what you propose in your reply brief can't be the rule. It strikes me that you've argued for a five-year look-back in your reply brief. Well, what I've talked about in the reply brief is the ERISA or the MEPA calculation of what withdrawal liability is. Now, we have not... The district court remanded the issue of apportionment. That's not been decided, but we need to... Presumably, we try to, whenever we can, provide guidance if a case gets remanded. So help me, if we agree with you on liability, it can't be a five-year look-back, can it? Because consider a situation where the DIP operates for five years. Under your proposal in your reply brief, if the DIP is in business for 30 years and it incurs all kinds of withdrawal liability, it's making all kinds of pension contributions through its payments to its employees during that 30 years, and then it files and it operates as a DIP for five years. If we adopt your rule, then the entire withdrawal liability is going to be the five years of post-petition operation. That can't be the rule, can it? That would be the statute, statutory application, absolutely. The definition of withdrawal liability... But here's the problem with that, though. They haven't created enough new vested benefits post-petition to cause their entire withdrawal liability. To cover the 35-year period. Do you follow? The benefits at the time... Withwithdrawal liability is always a moving continuum, and we heard that discussion earlier. And it is in the case law that it's a moving continuum and you have to take a look at where you're going to apply the obligation. And the statute says the last five years. The last five years. All right, but when we've got a bankruptcy statute and a debtor, are you still saying that it's strictly the five years, all of which might be post-petition, and none of it would be unsecured pre-petition despite the 30 years' worth of payments? Just because it's 30 years of pension credit, those credits may have been properly funded, and the withdrawal liability deficit or the unfunded liability may have occurred during the last five years. It's uncertain. You have to take a look at each particular fund. And we heard market fluctuations or actuarial experiences. But the bottom line is that the statute under MEPA sets forth a very detailed formula of how to apply it. The question is, in this situation, how much obligation would be apportioned to the debtor in possession as an administrative expense and accrued during the administrative period? And that issue has not been decided by the court because we haven't briefed that issue, and that was what was remanded. So I'm not going any further on that issue. Can I just ask one question in terms of your argument? Yes. How does that fare with the HNRC decision in terms of just the ability to do this in the first place? Well, the ability to do the calc... First, I think HNRC had it wrong. They said withdrawal liability is just too complicated, so we're not going to place that obligation on... as an administrative expense. It takes a look... It takes a look at the... from the wrong point of view. The pension fund... Remember, the pension fund is out here and not part of the bankruptcy. Their obligation is to fund this pension credit that is earned during the course of the administrative process. It's partly... The pension credit is the compensation. The withdrawal liability is the cost of that compensation. And I think that that's how you square this... the fund's argument here. HNRC had it all wrong. They said, you have withdrawal liability out here, it has no relationship to the bankruptcy. Well, I think that that's completely wrong. The relationship to the bankruptcy is the labour and the compensation for that labour is a pension. There are a lot of cases that agree with HNRC. Are there not? No, there are none.  No. In fact, this... That's a Sixth Circuit decision? That is just the Sixth Circuit and that's a bankruptcy appeal panel as opposed to McFarland, which is a Second Circuit court opinion. And there's another opinion, Cott. Understood. Go ahead. We haven't stopped you. I know you haven't. I'm just trying to get back to where... You are. Where I was going to start originally was talking about the balance of the equities. You have to understand that the pension fund is obligated under the collective bargaining agreement but is not a party to the collective bargaining agreement. The collective bargaining agreement is between the union and the debtor in possession or the debtor in advance. Well, if they haven't withdrawn from the collective bargaining agreement, we can assume that it's a current agreement. It's in effect. That's correct. It is in effect. The CBA is in effect? Collective bargaining agreement is in effect. I thought, no, an MOU was agreed to. Was it not? At the start of the bankruptcy, there was nine and a half months left of the collective bargaining agreement. The debtor in possession adopted that agreement, continued to operate it. Well, I think you said, well, that was assumed, but that was never assumed in the bankruptcy court. There was never a motion to assume that executory contract. Actually, I believe it's bankruptcy section 1113F. Under the A section, the debtor in possession has the ability to assume or to reject. Under F, they're obligated to continue to adhere to the collective bargaining agreement until they make such application to either negotiate changes to it or to then move to set it aside. And didn't they create a new agreement, the MOU? What occurred after the nine and a half months when the collective bargaining agreement by its own terms expired, they continued to meet and they reached an agreement that they would continue to adhere to those terms and conditions. And one of those terms and conditions, of course, was to participate in the pension fund and to make the contributions to the pension fund. The pension fund is, in essence, the tail here. The pension fund, as was earlier mentioned, is obligated now to fund this benefit for these individuals. And what we hear from the administrative end, from the debtor in possession, they don't care how you fund it. We don't want to be responsible for funding our own employees' obligations to that fund. And the bottom line that I'd like to leave here with is to have the court understand that the pension fund should not have to subsidize, and that's, in essence, what this would be doing if it's not recognized as an administrative expense, subsidize the operation of the debtor in possession on behalf of all the other creditors. I think we understand your position. Thank you. Thank you, Mr. Montalbo. Very briefly, a couple of points. The first is that I think that Mr. Montalbo has conceded that the fund whom he represents and who is the creditor in this case did not perform services directly to the bankruptcy estate. That's not the test, though. I mean, B doesn't say directly. It says the actual necessary costs and expenses. And isn't it true that we could conceive of necessary costs and expenses that are, in fact, indirect? Well, as the 503B has been interpreted, at least by the bankruptcy courts in this circuit, I have in the brief a couple of Delaware decisions of requirement that the services directly and substantially benefit the estate. And what we have in this situation is that the employees are compensated not by payments from the employer. The employments are compensated by pension credits. The employer is obliged by the collective bargaining agreement to make normal payments, normal payments to the fund, and it made all of the payments that it was contractually obliged to make. The second point is that Mr. Montalbo mischaracterized the decision in HNRC. It did not hold that the withdrawal liability was not an administrative expense because it was too complicated to calculate, but because the terms of that calculation, the size of the pie, depend on factors that have no relationship to the amount of services performed, and also because the beneficiaries are in very large part persons other than the employees or the debtor who provided the services. I cannot accept the fact that it can't be calculated. It just seems to me with what the computers can do today, it can be calculated. I'm going to proceed along that assumption. Unless somebody shifts and I'm wrong. I think the answer to that, Your Honor, is not that it can't be calculated. There are a variety of formulas you might use, the one being the one that I mentioned earlier, which is the difference between what withdrawal liability would have been at the date of the petition and what withdrawal liability is at the date of the actual withdrawal. Withdrawal liability is based on an employer's for the five years preceding withdrawal, right? Yes. Okay. That's the slice. I think that can be calculated. I saw a computer last night beat humans. Pretty badly. It was smart enough not to wager much. That's what really surprised me. That's going to be the night. But not smart enough to recognize that Toronto is not a city in the United States. My time has almost expired. You're not here to play Japanese. Watson has run the clock out on me. All I'm saying is that I at least don't think that we should decide this on the basis that withdrawal liability cannot be calculated. I don't think that that's the basis on which you would decide this. It's not that withdrawal liability cannot be calculated. It's that the basis on which you calculate is unrelated to the amount of services that are performed by employees post-petition. And therefore, that makes it an expense that is not within the control of the debtor in possession and not appropriate as an administrative expense. Are there no further questions? No. Is that okay? Okay. All right. Thank you, gentlemen. It's another difficult decision for us to have to make.